Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

Argued October 7, 2002          Decided July 8, 2003

No. 01-1335

SECRETARY OF LABOR,
MINE SAFETY AND HEALTH ADMINISTRATION,
PETITIONER

v.

EXCEL MINING, LLC, AND
FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION,
RESPONDENTS

---

On Petition for Review of an Order of the
Federal Mine Safety and Health Review Commission

---

*Robin A. Rosenbluth*, Attorney, U.S. Department of Labor, argued the cause for petitioner. With her on the briefs was *W. Christian Schumann*, Counsel.

*Grant Crandall* and *Judith Ellen Rivlin* were on the brief for *amicus curiae* United Mine Workers of America in support of petitioner.

---

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Timothy M. Biddle* argued the cause for respondent Excel Mining, LLC. With him on the brief were *Thomas C. Means* and *Edward M. Green*.

Before: SENTELLE, ROGERS, and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

Opinion dissenting filed by *Circuit Judge* SENTELLE.

GARLAND, *Circuit Judge*: For some 25 years, the Secretary of Labor has determined whether coal mine operators are complying with standards limiting miners' exposure to respirable coal dust by using a methodology that averages multiple dust samples taken over a single shift. In 1999, the Secretary issued three citations to Excel Mining, LLC for violating those standards. Excel appealed to the Federal Mine Safety and Health Review Commission, contending that the Secretary's longstanding compliance methodology was unlawful under the Federal Mine Safety and Health Act of 1977 (the "Mine Act"), 30 U.S.C. § 801 *et seq*., and that the only lawful method was to average multiple samples taken over multiple shifts. The Commission agreed with Excel and vacated the citations. The Secretary now petitions for review of the adverse judgment of the Commission. We grant the petition and reverse.

# I

Congress enacted the Federal Coal Mine Health and Safety Act of 1969 (the "Coal Act") "to develop and promulgate improved mandatory health or safety standards to protect the health and safety of the Nation's coal miners." Pub. L. No. 91–173, § 2(g), 83 Stat. 742, 743 (1969). In 1977, Congress incorporated the Coal Act into the more comprehensive Mine Act, Pub. L. No. 95–164, 91 Stat. 1290 (1977) (codified as amended at 30 U.S.C. § 801 *et seq*.). *See Secretary of Labor v. Cannelton Indus., Inc.*, 867 F.2d 1432, 1433 (D.C. Cir. 1989). The new legislation brought the mining of coal, metals, and non-metals under the same regulatory scheme and transferred enforcement powers and other duties from the

Secretary of the Interior to the Secretary of Labor. *See* 30 U.S.C. § 961(a).

Sections 101 and 103 of the Mine Act authorize the Secretary to promulgate mandatory safety and health standards for the nation's mines and to conduct regular inspections of those mines. *See* 30 U.S.C §§ 811, 813. Section 202(b)(2) of the Mine Act, originally enacted as part of the Coal Act, set the initial exposure standard for respirable coal dust at 2.0 milligrams per cubic meter of air. 30 U.S.C. § 842(b)(2). The section was intended "to provide, to the greatest extent possible, that the working conditions in each underground coal mine are sufficiently free of respirable dust concentrations in the mine atmosphere to permit each miner the opportunity to work underground during the period of his entire adult working life without incurring any disability from pneumoconiosis ["black lung" disease] or any other occupation-related disease during or at the end of such period." 30 U.S.C. § 841(b).

Section 202(b)(2) provides as follows:

> [E]ach operator shall continuously maintain the *average concentration* of respirable dust in the mine atmosphere during each shift to which each miner in the active workings of such mine is exposed at or below 2.0 milligrams of respirable dust per cubic meter of air.

30 U.S.C. § 842(b)(2) (emphasis added). The current mandatory health standard for respirable coal dust in underground mines, adopted by the Secretary of Labor in 1980 and codified at 30 C.F.R. § 70.100(a), tracks this statutory language. *See* Respirable Dust, 45 Fed. Reg. 23,990, 23,994–95, 24,001 (Apr. 8, 1980). The statutory term "average concentration" — of key import in this case — is defined in § 202(f) of the Mine Act as follows:

> [T]he term "average concentration" means a determination which accurately represents the atmospheric conditions with regard to respirable dust to which each miner in the active workings of a mine is exposed (1) as measured, during the 18 month period following Decem-

ber 30, 1969, over a number of continuous production shifts to be determined by the Secretary [of Labor; originally, the Secretary of the Interior] and the Secretary of Health and Human Services [originally, the Secretary of Health, Education, and Welfare (HEW)], and (2) as measured thereafter, over a single shift only, unless the Secretary [of Labor] and the Secretary of Health and Human Services find, in accordance with the provisions of section 811 of this title, that such single shift measurement will not, after applying valid statistical techniques to such measurement, accurately represent such atmospheric conditions during such shift.

30 U.S.C. § 842(f).

Section 202(f) of the Mine Act is taken essentially verbatim from § 202(f) of the Coal Act. In 1972, acting pursuant to the Coal Act, the Secretaries of the Interior and HEW made the joint finding referred to in § 202(f), concluding that "single shift measurement of respirable dust will not, after applying valid statistical techniques to such measurement, accurately represent the atmospheric conditions to which the miner is continuously exposed." Notice of Finding That a Single Shift Measurement of Respirable Dust Will Not Accurately Represent Atmospheric Conditions During Such Shift, 37 Fed. Reg. 3833 (Feb. 23, 1972) [hereinafter Joint Finding]. Pursuant to Mine Act § 301(b)(1) and (c)(2), all standards, decisions, determinations, and regulations issued under the Coal Act remain in effect under the Mine Act until modified or set aside. 30 U.S.C. § 961(b)(1), (c)(2). The Joint Finding has not been modified or set aside, and continues in effect.[1]

To ensure compliance with mandatory health standards, Mine Act § 103(a) directs the Labor Department's Mine Safety and Health Administration (MSHA) to test the atmosphere of each underground mine "in its entirety" at least four times annually. 30 U.S.C. § 813(a). If "upon inspection

---

[1] The Secretary of Labor and the Secretary of Health and Human Services have recently proposed rescinding the 1972 Joint Finding. *See* Determination of Concentration of Respirable Coal Mine Dust, 68 Fed. Reg. 10,940 (Mar. 6, 2003).

or investigation" a MSHA inspector discovers a violation of the Mine Act or of a mandatory standard, he must issue a citation to the operator. *Id.* § 814(a). Section 110(a) of the Mine Act provides for the assessment of civil penalties for such violations. *Id.* § 820(a). An operator can appeal to the Federal Mine Safety and Health Review Commission (FMSHRC or the "Commission"), *id.* § 815(d), and the losing party can then seek review before the appropriate United States Court of Appeals, *id.* § 816.

Since 1975, the Secretary of the Interior and his successor, the Secretary of Labor, have based regular compliance determinations under the respirable dust standard on the average of multiple measurements taken over a single shift. *See* Coal Mine Respirable Dust Standard Noncompliance Determinations, 63 Fed. Reg. 5687, 5687 (Feb. 3, 1998); Joint Stipulations and Statements of Uncontested Fact at 3 (J.A. at 8) [hereinafter Joint Stip.]. Using this methodology, MSHA inspectors collect respirable dust samples during one full shift from miners assigned to different occupations in the same mechanized mining unit. 63 Fed. Reg. at 5687; Joint Stip. at 3 (J.A. at 8). The samples are then averaged, and MSHA issues a citation under 30 C.F.R. § 70.100(a) if the average concentration of respirable dust from all of the occupations exceeds the applicable standard. 63 Fed. Reg. at 5687; Joint Stip. at 3 (J.A. at 8).

In March 1999, MSHA inspectors issued three citations to Excel Mining, charging violations of § 70.100(a)'s respirable dust standard. Each citation was based on an average of multiple samples taken over a single shift, and in each case the average respirable dust concentration substantially exceeded the applicable standard. *See* Joint Stip. at 2 (J.A. at 7). Excel contested the citations before the Commission, maintaining that under both Mine Act § 202(f) and the 1972 Joint Finding, MSHA was barred from using any kind of single-shift sampling for enforcement purposes and was limited to multiple-shift sampling exclusively. The Secretary took the position that, although the statute and Joint Finding barred her from making a compliance determination on the basis of a single full-shift sample, she was free to make such a

determination based on an average of multiple samples taken over a single shift ("multiple single-shift samples").[2]

The Commission ruled in favor of Excel and vacated the three citations. *Excel Mining, LLC v. Sec'y of Labor*, 23 FMSHRC 600 (2001). Two commissioners concluded that both § 202(f) and the Joint Finding "envision[ed] but two methods of respirable dust sampling — single-shift measurements and measurements derived from samples taken over a number of continuous production shifts," and that together they unambiguously barred "*all* single shift sampling." *Id.* at 605, 606 (Riley and Verheggen, Comm'rs). A third commissioner agreed with the Secretary that the Joint Finding was ambiguous on the question, but concluded that the Secretary's interpretation was unreasonable on policy grounds. *Id.* at 614 (Beatty, Comm'r, concurring).[3] Exercising her statu-

---

[2] The Secretary describes single full-shift sampling as follows:

> A single, full-shift measurement of respirable coal mine dust is obtained with an approved sampler unit, which is either worn or carried by the miner . . . during the entire shift. . . . A portable, battery-powered pump draws dust-laden mine air . . . through the pre-weighed filter leaving the particles deposited on the filter surface. . . . The concentration of respirable dust, expressed as milligrams per cubic meter (mg/m³) of air, is determined by dividing the observed weight gain [of the filter] by the volume of mine air passing through the filter and then multiplying this quantity by a conversion factor. . . .

Determination of Concentration of Respirable Coal Mine Dust, 65 Fed. Reg. 42,068, 42,091 (July 7, 2000). All three of the methodologies discussed here — single full-shift sampling, multiple single-shift sampling, and multiple-shift sampling — involve collecting dust over entire shifts, and hence are properly described as full-shift sampling. *See* Excel Br. at 5 n.4.

[3] The fourth commissioner dissented, concluding that the 1972 Joint Finding was invalid, and that § 202(f) should therefore be interpreted as if no finding had been made. 23 FMSHRC at 615–20 (Jordan, Chairman, dissenting). Since neither of the parties makes that argument here, we do not consider it. *See Narragansett Indian Tribe v. Nat'l Indian Gaming Comm'n*, 158 F.3d 1335, 1338 (D.C. Cir. 1998).

tory right under 30 U.S.C. § 816, the Secretary petitions for review of the Commission's decision.

## II

The standard of review applicable to this petition is set out in our opinion in *Cannelton Industries*, 867 F.2d at 1435. Under the Mine Act, the Secretary's interpretation of the law must " 'be given weight by both the Commission and the courts.' " *Id.* (quoting S. REP. NO. 95–181, at 49 (1977)). When, as here, "the Secretary and the Commission divide, it [is] . . . the Secretary rather than the Commission [who] is entitled to the deference described in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)." *Id.*; *see RAG Cumberland Res. LP v. FMSHRC*, 272 F.3d 590, 596 (D.C. Cir. 2001); *Secretary of Labor v. FMSHRC*, 111 F.3d 913, 920 (D.C. Cir. 1997); *cf. Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 152–53 (1991).

Under the first step of *Chevron*, "this court . . . 'must give effect to the unambiguously expressed intent of Congress.' " *Cannelton Indus.*, 867 F.2d at 1435 (quoting *Chevron*, 467 U.S. at 843). But "when 'the statute is silent or ambiguous with respect to the specific issue,' the question for this court . . . is whether the Secretary's interpretation is 'a permissible construction of the statute.' " *Id.* (quoting *Chevron*, 467 U.S. at 843); *see Secretary of Labor v. FMSHRC*, 111 F.3d at 916. Under this second step, the court must defer to "a reasonable interpretation made by the administrator of [the] agency." *Chevron*, 467 U.S. at 844. Moreover, in the statutory scheme of the Mine Act, " 'the Secretary's litigating position before [the Commission] is as much an exercise of delegated law-making powers as is the Secretary's promulgation of a . . . health and safety standard,' " and is therefore deserving of deference. *RAG Cumberland*, 272 F.3d at 596 n.9 (quoting *Martin*, 499 U.S. at 157).[4]

---

[4] *Compare Martin*, 499 U.S. at 157 (holding that, "when embodied in [an OSH Act] citation, the Secretary's interpretation assumes a form expressly provided for by Congress" (citations omitted)), *with*

The "Secretary is emphatically due this [same] respect when she interprets her own regulations." *Cannelton Indus.*, 867 F.2d at 1435 (citing *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 566 (1980)). We must defer to her interpretation " 'unless it is plainly erroneous or inconsistent with the regulation.' " *Akzo Nobel Salt, Inc. v. FMSHRC*, 212 F.3d 1301, 1303 (D.C. Cir. 2000) (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)). And, as with conflicts over statutory interpretation, it is the Secretary rather than the Commission who deserves our deference when the two differ over a regulation's meaning. *Id.*; *see Energy West Mining Co. v. FMSHRC*, 40 F.3d 457, 463–64 (D.C. Cir. 1994).

Excel argues that this ordinary rule of deference to an agency's regulatory interpretation should not apply to the Secretary of Labor's construction of the 1972 Joint Finding, a finding that was made not by her but by the Secretary of the Interior and the Secretary of HEW. Excel does not rest this argument simply on the fact that the Secretary of Labor was not involved in the promulgation of the Joint Finding. Indeed, the company concedes that, as early as 1975, the Secretary of the Interior interpreted the Joint Finding in the same way the Secretary of Labor does now, and that the latter has succeeded to the former's role under the statute. Excel Br. at 38; *see Energy West*, 40 F.3d at 460 n.1 (holding that appellate review of mine regulations promulgated by the Secretary of the Interior proceeds as if the regulations were originally promulgated by the Secretary of Labor); *see also Amerada Hess Pipeline Corp. v. Fed. Energy Regulatory Comm'n*, 117 F.3d 596, 600–01 (D.C. Cir. 1997) (deferring to FERC's interpretation of a regulation promulgated by the ICC before the ICC's authority over oil pipelines was transferred to FERC). Rather, it is the Secretary of HEW's involvement in the Joint Finding, Excel says, that renders

*Sturm, Ruger & Co., Inc. v. Chao*, 300 F.3d 867, 872 (D.C. Cir. 2002) (noting that the "administrative and judicial review procedures in the OSH Act are nearly identical to those in the Mine Act" (internal quotation marks omitted)).

deference to the Secretary of Labor's interpretation unwarranted.

It is true that we do not generally accord deference to one agency's interpretation of a regulation issued and administered by another agency. *See Amerada Hess*, 117 F.3d at 600. But that does not help Excel here. The Mine Act grants the Secretary of Labor the authority to "develop, promulgate, and revise as may be appropriate, improved mandatory health or safety standards," 30 U.S.C. § 811(a), and to enforce those standards by citing mine operators for violations, *id.* § 814(a).[5] It further provides that standards, decisions, regulations, and determinations issued under the Coal Act remain in effect until the Secretary of Labor revises them. *Id.* § 961(b)(1), (c)(2). As we explained in *Paralyzed Veterans of America v. D.C. Arena LP*, where we granted deference to the Justice Department's interpretation of a regulation that was initially drafted by another agency but subsequently adopted and administered by Justice:

> We do not defer . . . to an administrative agency's interpretation of its regulation solely because its employees are the drafters and presumably have superior knowledge as to what they intended. . . . [T]he doctrine of deference is based primarily on the agency's statutory role as the sponsor of the regulation, not necessarily on its drafting expertise. . . . Under *Chevron*, an agency's interpretation of ambiguous statutory language is entitled to deference because of the agency's delegated authority to administer the statute, and the same consideration underlies deference to an agency's interpretation of its own regulation.

117 F.3d 579, 585 (D.C. Cir. 1997); *see Amerada Hess*, 117 F.3d at 601 (rejecting an argument that the court should deny deference to FERC because that agency did not promulgate the regulation at issue, noting that "[c]ourts defer to agency

---

[5] The mandatory health standard that MSHA determined was violated in this case — the standard for respirable coal dust codified at 30 C.F.R. § 70.100(a) — was formally adopted by the Secretary of Labor in 1980. *See* 45 Fed. Reg. at 23,995.

10

interpretations in large part because Congress has chosen to delegate to the agency decisionmaking in the field"). This analysis applies here as well, and we therefore accord appropriate deference to the Secretary of Labor's interpretation of both the Mine Act and the 1972 Joint Finding.

Finally, in evaluating the reasonableness of the Secretary's interpretation of the statute and the Joint Finding, we take into account the fact that her reading tracks both the Department of the Interior's and the Department of Labor's original interpretation, adopted at a time when the origins of both the statute and the finding were fresh in the minds of their administrators. Likewise, we give weight to the fact that the agency that administers the statute and the Joint Finding has interpreted them the same way for more than 25 years. *See Barnhart v. Walton*, 535 U.S. 212, 220 (2002) ("[T]his Court will normally accord particular deference to an agency interpretation of longstanding duration." (internal quotation marks omitted)).[6]

We now proceed to examine the validity of the Secretary's interpretation. We consider the question of statutory inter-

---

[6] The history of this departmental interpretation is set forth at 63 Fed. Reg. at 5687–89, and is not contested by Excel, *see* Excel Br. at 13; Joint Stip. at 3 (J.A. at 8). *See also Excel Mining*, 23 FMSHRC at 602; 65 Fed. Reg. at 42,072–73. Although the Secretary has always read the statute and Joint Finding to permit multiple single-shift sampling, from 1991–94 MSHA also conducted a Spot Inspection Program at selected mines, under which a citation was issued when a single full-shift measurement exceeded the respirable dust standard by a specified amount. MSHA contended that the Joint Finding did not bar the program because the finding pertained to operator sampling, while the program involved MSHA sampling only. The Commission, however, rejected that argument, *Secretary of Labor v. Keystone Coal Mines Corp.*, 16 FMSHRC 6 (1994), and MSHA terminated the program. *See* 63 Fed. Reg. at 5688; Mine Shift Atmospheric Conditions; Respirable Dust Sample, 62 Fed. Reg. 68,372, 68,375 (Dec. 31, 1997) (describing Spot Inspection Program); Joint Stip. at 3 (J.A. at 8) (stipulating that each citation in *Keystone* was based on a single sample).

pretation in Part III and that of regulatory interpretation in Part IV.

## III

Excel contends that this case is resolved by a simple application of *Chevron*'s first step. According to the company, Mine Act § 202(f) unambiguously requires the Secretary to use multiple-shift samples to measure respirable dust, and bars her from using any kind of single-shift methodology. By contrast, the Secretary argues that the case is resolved by *Chevron*'s second step, because the language of the Act is ambiguous on this question and her construction is reasonable. According to the Secretary, the Mine Act permits her to use either multiple-shift samples or multiple single-shift samples to calculate average dust concentration for enforcement purposes. The only kind of measurement that is barred, in her view, is the use of a single full-shift sample — which measures a single miner's exposure over a single shift.

The starting place for our analysis is Mine Act § 202(b)(2), originally part of the Coal Act, which sets the initial exposure standard for respirable dust. That section requires that each mine operator "continuously maintain the *average concentration* of respirable dust in the mine atmosphere during each shift to which each miner in the active workings of such mine is exposed at or below 2.0 milligrams of respirable dust per cubic meter of air." 30 U.S.C. § 842(b)(2) (emphasis added). Needless to say, the language of this section does not unambiguously resolve this dispute, as all three methodologies at issue here involve the use of "averages": Excel's multiple-shift method averages results over several shifts; the Secretary's multiple single-shift method averages results over a single shift; and the single full-shift method calculates the average exposure of a single miner over an entire shift. *See supra* note 2.

We next turn to Mine Act § 202(f), which defines "average concentration" for purposes of § 202(b) and which is the statutory provision at the heart of this litigation. The first part of § 202(f) contains a definition that, both parties agree,

effectively required the Secretary to use the multiple-shift method for the first 18 months after passage of the Coal Act, a period that began on December 30, 1969, and ended in 1971. *See* 30 U.S.C. § 842(f)(1). Thereafter, § 202(f) defines "average concentration" as:

> a determination which accurately represents the atmospheric conditions with regard to respirable dust to which *each* miner in the active workings of a mine is exposed . . . (2) as measured . . . , *over a single shift only*, unless the Secretary [of Labor; originally, the Secretary of the Interior] and the Secretary of Health and Human Services [originally, the Secretary of HEW] find, in accordance with the provisions of section 811 of this title, that *such single shift measurement* will not, after applying valid statistical techniques to such *measurement*, accurately represent such atmospheric conditions during such shift.

30 U.S.C. § 842(f) (emphasis added). Although they disagree as to its meaning, *see infra* Part IV, both parties agree that the 1972 Joint Finding is the finding contemplated in § 202(f), and neither party questions its validity. Our statutory construction therefore proceeds on that assumption. *See supra* note 3.

Excel contends that there is only one way to read § 202(f): because the section requires measurement "over a single shift only" unless the Secretaries make a joint finding, and because the Secretaries made such a finding, measurements over a single shift — however they are made — are barred. This is certainly a plausible reading. But the Secretary's arguments persuade us that such an interpretation is not unambiguously required, and that her reading is at least a reasonable one.

To begin, we note that although § 202(f) uses the phrase "over a single shift only," the subsection thereafter refers to that methodology as "such single shift measurement." *See* 30 U.S.C. § 842(f). The Secretary points out that this reference phrase introduces at least two ambiguities. First, if one emphasizes the word "single," the result suggests that while Congress was concerned that a "*single* shift measurement"

might not "accurately represent . . . atmospheric conditions during [a] shift," the legislature was not necessarily concerned about the use of *multiple* measurements — whether taken over a single shift or over several.[7]  This reading is not unreasonable.

A second ambiguity in the same reference phrase arises from its use of the singular "measurement," rather than the plural "measurement*s*."  *See* 30 U.S.C. § 842(f).  The use of the singular, the Secretary argues, can reasonably be interpreted as referring to the taking of a single as opposed to multiple samples, even over a single shift.  This ambiguity is reinforced by a second use of the singular noun "measurement," as well by the preceding term "each miner" instead of "miner*s*."  *See id.*  Two members of the Commission rejected this argument on the basis of a canon of statutory construction providing that "terms written in the singular generally include the plural."  *Excel Mining*, 23 FMSHRC at 606 (Riley and Verheggen, Comm'rs).  But to say that the singular "generally" includes the plural acknowledges that there are exceptions, and hence that the singular can be ambiguous.  Indeed, Excel's own brief implicitly recognizes the ambiguity of the singular, arguing that "the term 'measurement' *can* be both singular and plural in meaning."  Excel Br. at 28 (emphasis added).

There are also two ambiguities embedded in the phrase "as measured . . ., over a single shift only, unless the Secretar[ies] . . . find . . . ."  30 U.S.C. § 842(f).  The first ambiguity stems from the statute's use of the word "only."  The Secretary observes that although this means that she *must* measure dust over a single shift if there is no finding, the implication is that if there is a finding (as there is here) she is not restricted to single-shift measurement *only* but instead has her choice of single- or multiple-shift measurement.  The second ambiguity has its source in the word "unless."  The Secretary notes that while the word clearly restricts her to single-shift measurement in the absence of a finding, the

---

[7] This ambiguity can also be highlighted by the use of a hyphen: to the Secretary's eyes, the reference phrase reads "single shift-measurement," not "single-shift measurement."

section is silent as to what she must do if a finding is made. In light of that silence, we must accord deference to any reasonable construction proffered by the Secretary. *See Chevron,* 467 U.S. at 843. And it is not unreasonable for her to conclude that without an express restriction she is free to use whichever of the two methodologies — multiple single-shift sampling or multiple-shift sampling — she thinks most appropriate for a particular mine.

The Secretary also persuades us that her interpretation is reasonable in light of the role that § 202(f) plays in the Mine Act, which is to provide a definition for the term "average concentration" as used in § 202(b).[8] The Secretary notes that the purpose of the latter section is to ensure that "each operator shall continuously maintain the average concentration of respirable dust in the mine atmosphere *during each shift* to which *each miner* in the active workings of such mine is exposed at or below 2.0 milligrams of respirable dust per cubic meter of air." 30 U.S.C. § 842(b)(2) (emphasis added). A single full-shift sample may not accomplish this purpose, she argues, because it measures the exposure of only one miner — whose exposure may be different from that of other miners performing different jobs on the same shift — while the statute requires protection for "each" miner. As a consequence, she postulates, it is logical to conclude that it was the statistical accuracy of single full-shift sampling that was the object of Congress' concern in § 202(f)(2).

---

[8] Although both sides further urge us to rely upon the legislative history of § 202(f), we find little there that is useful. The original House bill was apparently intended to require the use of multiple shift sampling for compliance determinations, although it did not use those words. *See* H. REP. NO. 91–563, at 15 (1969). By contrast, the Senate bill was apparently intended to bar multiple shift sampling, although it also did not employ those words. *See* S. REP. NO. 91–411, at 20 (1969). Section 202(f) appears to have been a compromise, mandating multiple shift sampling for the first 18 months and single shift measurement thereafter unless the Secretaries found such measurement to be statistically inaccurate. But nothing in the legislative history explains what Congress meant by "single shift measurement."

But, the Secretary continues, she also cannot accomplish the statutory purpose of ensuring that the average concentration of respirable dust "during *each shift*" is at or below 2.0 mg/m$^3$ if she is restricted — as Excel insists she is — to averaging samples taken over multiple shifts. As the Secretary explains, a multiple-shift average may mask a high concentration on a particular shift: for example, an above-threshold sample collected on the first shift, averaged with sub-threshold samples collected on subsequent shifts, may yield a sub-threshold average — even though each miner on the first shift is exposed to more than 2.0 mg/m$^3$. *See* 63 Fed. Reg. at 5688. Data collected by MSHA during the course of its Spot Inspection Program reveals that this is not a hypothetical problem.[9] And it is not unreasonable to infer, as the Secretary does, that Congress did not intend to require her to use a methodology (multiple-shift sampling) that is incompatible with the legislature's purpose of ensuring that the average concentration of respirable dust "during each shift" remains below the designated threshold.

Excel responds that the Secretary's method has masking problems of its own. Basing compliance on the average of multiple samples taken over a single shift may hide the high dust exposure of a particular miner on that shift. And if the shift is not well chosen, this method may also mask an above-threshold exposure on another shift. The Secretary does not

---

[9] MSHA describes the data as follows:

[T]he initial full-shift samples collected by an inspector are likely to show higher dust concentrations than succeeding samples collected on subsequent shifts during the same inspection. MSHA's data showed that the average concentration of all samples taken on the same occupation on the first day of an inspection was almost twice as high as the average concentration of those taken on the second day.

63 Fed. Reg. at 5688. MSHA explains that such subsequent, unrepresentative measurements "would arise if mine operators anticipated the continuation of inspector sampling and made adjustments in dust control parameters or production rates to reduce dust levels during the subsequent monitoring." *Id.*

dispute these possibilities. But she also does not read the Mine Act as limiting her to the use of multiple samples over a single shift. Rather, she believes that she also retains discretion to use multiple samples over multiple shifts. She intends, she says, to choose the method that best protects miners under the conditions in a particular mine. Where the problem is variance in the quantity of atmospheric dust within a shift, she may well choose Excel's preferred method — multiple-shift sampling — concentrating on miners who are working in an occupation with the highest dust exposure.[10] But where there is significant variance between shifts, she may instead choose to take multiple samples over a single shift, focusing on the shift with the highest concentration of dust.

Excel asserts that, notwithstanding this administrative flexibility, multiple single-shift sampling is "especially unreliable" as an indicator of the respirable dust levels to which individual miners are exposed, and is thus inadequate to protect miners' health. Excel Br. at 24. The Commission similarly describes the methodology as "ill-advised." *Excel Mining*, 23 FMSHRC at 608 (Riley and Verheggen, Comm'rs). Needless to say, the Secretary disagrees — as does the United Mine Workers union, which filed an amicus brief in support of the Secretary. This court lacks the experience and expertise to

---

[10] The Secretary's longstanding multiple single-shift sampling methodology employed the following corrective for intra-shift variance:

> The mine operator was cited if the average of all measurements obtained during the same shift exceeded the applicable standard.... If one or more measurements exceeded the applicable standard but the average did not, the Agency's practice was to continue sampling for up to four additional production shifts or days. If the inspector continued sampling after the first day because a previous measurement exceeded the applicable standard, noncompliance determinations were based on either the average of all measurements taken or on the average of measurements taken on any one occupation.

63 Fed. Reg. at 5687.

resolve that methodological dispute. But more to the point, we lack the authority to do so. When "a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail." *Chevron*, 467 U.S. at 866; *see also Cannelton Indus.*, 867 F.2d at 1435.

In sum, we conclude that the statutory language is ambiguous and that the Secretary's interpretation is reasonable. And we decline to second-guess the Secretary's longstanding view that taking multiple samples over both single and multiple shifts is a reasonable and effective means of effectuating the purpose of the Mine Act.[11]

IV

We turn next to the 1972 Joint Finding. In light of our affirmation of the Secretary's interpretation of Mine Act § 202(f), and because the parties dispute neither the validity of that finding nor the fact that its promulgation triggers the consequences contemplated by § 202(f)(2), the finding itself does not have great independent significance for our analysis. Nonetheless, our review confirms that it is reasonably read —

_____

[11] In its brief in this court, Excel argues that, even if Mine Act § 202(f)(2) does not preclude the Secretary from using multiple samples over a single shift, the citations issued against the company are still invalid because the Act contains no affirmative authorization for the Secretary to use such samples to determine compliance with mandatory health standards. The Secretary responds that the necessary authority is provided by Mine Act §§ 103(a) and 202(g). *See* 30 U.S.C. §§ 813(a), 842(g). Although it appears that the Secretary has the better of the argument, *see generally Chao v. Rothermel*, 327 F.3d 223, 225–27 (3d Cir. 2003) (describing the "ample authority" provided by §§ 103(a) and 202(g)), we do not consider its merits because Excel failed to raise it before the Commission and offers no excuse for not doing so. *See* 30 U.S.C. § 816(a) ("No objection that has not been urged before the Commission shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.").

as the Secretary urges — as a determination that single full-shift sampling is an inaccurate methodology for measuring exposure to respirable dust, while expressing no opinion regarding the accuracy of taking multiple samples over a single shift.

As we said in Part II, we must uphold the Secretary of Labor's interpretation " 'unless it is plainly erroneous or inconsistent with the regulation.' " *Akzo Nobel*, 212 F.3d at 1303 (quoting *Thomas Jefferson Univ.*, 512 U.S. at 512). We also take notice of the facts that: (1) as early as 1975, the Secretary of the Interior, who joined in making the finding in 1972, interpreted it just the way the Secretary of Labor does now; and (2) the agency that administers the section has consistently interpreted it that same way for more than 25 years. *See Barnhart*, 535 U.S. at 219–20.

The Joint Finding states in pertinent part:

> Pursuant to section 202(f) of the Federal Coal Mine Health and Safety Act of 1969 . . ., there was published in the FEDERAL REGISTER . . . a proposed notice of finding by the Secretary of the Interior and the Secretary of Health, Education, and Welfare that single shift *measurement* of respirable dust will not, after applying valid statistical techniques to *such measurement*, accurately represent the atmospheric conditions to which the miner is continuously exposed. . . . After careful consideration of all comments, suggestions, and objections, it is the conclusion of the Secretary of the Interior and the Secretary of Health, Education, and Welfare that. . . . [t]he proposed finding . . . that *a measurement* of respirable dust over a single shift only, will not, after applying valid statistical techniques to such *measurement*, accurately represent the atmospheric conditions to which *the miner* under consideration is continuously exposed, is hereby adopted without change.

37 Fed. Reg. at 3833–34 (emphasis added). The Secretary points out that, like the statute, the Joint Finding is written in the singular. It states that "*a measurement* of respirable dust over a single shift only will not . . . accurately represent

the atmospheric conditions to which *the miner* under consideration is continuously exposed." *Id.* at 3834. Although Excel reasonably argues that an average can itself be considered a "measurement," and that the term "the miner" can be read as referring to miners in general, we cannot declare unreasonable the Secretary's view that all the Joint Finding determined was that "a" single "measurement" of a particular "miner" was an insufficiently accurate methodology. This construction therefore leaves it open to the Secretary to measure compliance based on an average of multiple samples taken over a single shift — a methodology that involves more than one measurement taken from more than one miner. 63 Fed. Reg. at 5687.

The Secretary's interpretation is also supported by language in the proposed notice of finding that preceded (and was adopted in) the Joint Finding. That notice described the statistical work undertaken in support of the proposed finding as follows:

> In April 1971, a statistical analysis was conducted by the Bureau of Mines, using as a basis the current basic samples for the 2,179 working sections in compliance with the dust standard on the date of the analysis.... The results ... show[ed] that *a* single shift *measurement* would not, after applying valid statistical techniques, accurately represent the atmospheric conditions to which the miner is continuously exposed.

Notice of Finding That Single Shift Measurements of Respirable Dust Will Not Accurately Represent Atmospheric Conditions During Such Shift, 36 Fed. Reg. 13,286, 13,286 (July 17, 1971) (emphasis added).[12] As interpreted by the Secretary, this passage explains that the basis for the Joint Finding was a statistical analysis showing that "a" single "measurement"

---

[12] Excel correctly notes that the title of the 1971 proposed notice employed the plural, "Single Shift Measurement*s*." *See* 36 Fed. Reg. at 13,286 (emphasis added). This does not erase or resolve the ambiguity, however, since the title of the 1972 Joint Finding used the singular, "*a* Single Shift *Measurement*." 37 Fed. Reg. at 3833 (emphasis added).

was not an accurate way to represent atmospheric conditions. *See also Excel Mining*, 23 FMSHRC at 607 (Riley and Verheggen, Comm'rs) ("The focus of the [1972] Finding is on the reliability of discrete single shift measurements. By comparing the results of many such single shift samples, the Secretaries determined the statistical reliability of any given sample, and found that, statistically speaking, any given single shift sample was not reliable."). It is therefore fair to infer that the Joint Finding was intended to preclude only that kind of measurement.

In sum, the Joint Finding is at least as ambiguous as § 202(f), and because its wording is similar to that of the statute, our conclusion is the same: the Secretary's interpretation is reasonable.

## V

The questions of interpretation posed by this petition are difficult — largely because of the complicated syntax of the statutory and regulatory language. On balance, however, we think that the Secretary's longstanding interpretation is reasonable, and because that is all that is necessary for her view to prevail, we grant the petition for review and reverse the decision of the Commission.

*So ordered.*

1

SENTELLE, *Circuit Judge, dissenting*: The majority accurately sets forth the background in this case and the appropriate standard of review. I do not believe it properly applies that standard to those facts. As the majority reminds us, courts "must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984). The two-step *Chevron* analysis comes into play only when "the statute is silent or ambiguous with respect to the specific issue" under review. *Id.* As I understand the specific issue before us, it is whether the Secretary may make the determination of average concentration more than eighteen months after December 30, 1969, by measurement over a single shift after a finding that "single shift measurement of respirable dust will not, after applying valid statistical techniques to such measurement, accurately represent the atmospheric conditions to which the miner is continuously exposed." *Notice of Finding that a Single Shift Measurement of Respirable Dust Will Not Accurately Represent Atmospheric Conditions During Such Shift*, 37 Fed. Reg. 3833 (Feb. 23, 1972).

The statute passed by Congress says that after that trigger date, the average concentration is "as measured . . . over a single shift only, *unless* the Secretar[ies] find . . . that such single shift measurement will not . . . accurately represent such atmospheric conditions during such shift." 30 U.S.C. § 842(f). I am aware, as we have observed in the past, that "some will find ambiguity even in a 'No Smoking' sign. . . ." *Int'l Union, United Auto. Aerospace & Agric. Implement Workers of America v. General Dynamics Land Sys. Div.*, 815 F.2d 1570, 1575 (D.C. Cir. 1987). I see no more ambiguity on the specific issue in this case than in a "No Smoking" sign. Single shift measurement is to be used unless the finding is made. Here the finding has been made. I do not see how the statute can be read as authorizing the use of single shift measurement.

Obviously since I find no ambiguity, I would not reach the second step of *Chevron* to pursue the reasonableness of the interpretation. However, as the majority does reach that step, I will comment briefly upon it. The question at that

second step is: whether the administrative interpretation is a "permissible construction of the statute," *Chevron*, 467 U.S. at 843. A permissible construction to which we must defer is "a reasonable interpretation made by the administrator of [the] agency." *Id.* at 844. I not only do not find the Secretary's construction of the statute to be a reasonable one, I am not at all certain what the construction is. After reviewing the record before us and the opinion of the majority, I am still at a loss to understand how the Secretary construes the words of 30 U.S.C. § 842(f) to allow the use of single shift measurement after the adverse finding has been made.

I agree with the majority that the syntax of the statute and the regulation are complicated. This has perhaps created a problem of interpretation. But the resolution of that problem is for Congress, not the Secretary or the court. I understand the Secretary is pursuing the laudable goals set forth by Congress "to provide, to the greatest extent possible, that the working conditions in each underground coal mine are sufficiently free of respirable dust concentrations in the mine atmosphere to permit each miner the opportunity to work underground during the period of his entire adult working life without incurring any disability from pneumoconiosis or any other occupation related disease during or at the end of such period." 30 U.S.C. § 841(b). But as we have observed before, the congressional motivation in a statute, no matter how exemplary, does not issue to the administrative agency "a roving commission to achieve [any] laudable goal." *Michigan v. EPA*, 268 F.3d 1075, 1084 (D.C. Cir. 2001). Any federal agency's authority must be derived from the statute under which it operates, and unless it is within that portfolio, the agency's acts, no matter how reasonable or beneficent, are not consistent with law. In my view, the Secretary here has overstepped that statutory empowerment. I therefore respectfully dissent.