# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued February 14, 2013          Decided June 7, 2013

No. 11-1464

CUMBERLAND COAL RESOURCES, LP,
PETITIONER

v.

FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION
AND SECRETARY OF LABOR,
RESPONDENTS

UNITED MINE WORKERS OF AMERICA,
INTERVENOR

On Petition for Review of a Decision of the
Federal Mine Safety and Health Review Commission

*Ralph Henry Moore II* argued the cause for petitioner. With him on the briefs was *Patrick W. Dennison*.

*Robin A. Rosenbluth*, Senior Attorney, U.S. Department of Labor, argued the cause for respondent. With him on the brief were *W. Christian Schumann*, Counsel. *John T. Sullivan*, Attorney, Mine Safety and Health Review Commission, entered an appearance.

*Judith Rivlin* and *Arthur Traynor* were on the brief for intervenor United Mine Workers of America in support of

respondent.

Before: ROGERS and TATEL, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SENTELLE.

SENTELLE, *Senior Circuit Judge*: This case comes before us on a petition for review of the Federal Mine Safety and Health Review Commission's determination that Cumberland Coal Resources, LP's failure to maintain adequate emergency lifelines in its mine's escapeways was a significant and substantial violation of the Federal Mine Safety and Health Act of 1977 ("Mine Act"), 30 U.S.C. § 814(d)(1). Cumberland argues that the Commission applied the wrong standard when it reversed an administrative law judge's ("ALJ's") determination that the violations were not significant and substantial, and that even if it applied the correct standard, its findings are not supported by substantial evidence. Because we conclude that the Commission applied the correct standard and that substantial evidence supported its findings, we deny Cumberland's petition for review.

## I. BACKGROUND

### A. Statutory and Regulatory Background

In 1977, Congress enacted the Federal Mine Safety and Health Act for the purpose of improving the working conditions of miners. 30 U.S.C. § 801. Under the Act, inspectors from the Mine Safety and Health Administration ("MSHA"), acting on behalf of the Secretary of Labor, conduct regular compliance inspections of mines. 30 U.S.C. § 813(a). When an inspector believes that the operator of a mine has violated the Act or

enforceable regulations promulgated pursuant to the Act, the inspector is authorized to issue citations for such violations and, in appropriate cases, to issue orders to withdraw personnel from the mine until "such violation has been abated." 30 U.S.C. § 814(b). Section 814(d)(1) provides that if the authorized representative of the Secretary finds that there has been a violation of a mandatory health or safety standard and also finds that the violation "is of such nature as could significantly and substantially contribute to the cause and effect of a coal or other mine safety or health hazard," then the inspector is to include that finding in the citation issued for the violation. Such a finding of a significant and substantial violation (often referred to as an "S&S violation") is a precondition for enhanced enforcement actions under the Mine Safety Act. *See* 30 U.S.C. § 814(d) (discussed and applied in *RAG Cumberland Resources LP v. FMSHRC*, 272 F.3d 590, 592 93 (D.C. Cir. 2001)).

The violations at issue in this case arose under amendments to the Mine Safety and Health Act enacted in response to three multiple-fatality mine disasters, in which miners who were unable to evacuate mines died. Specifically, the Mine Improvement and New Emergency Response Act of 2006 ("MINER Act"), amended 30 U.S.C. § 876 to require operators to provide flame resistant and directional lifelines in escapeways "to enable evacuation." MINER Act Section 2(3)(b)(E)(iv), Pub. L. No. 109-236 (S. 2803) (June 15, 2006), codified at 30 U.S.C. § 876(b)(2)(E)(iv). Also in the wake of the disasters, MSHA issued an Emergency Temporary Standard on emergency mine evacuations in March 2006. 71 Fed. Reg. 12252 (Mar. 9, 2006). This standard became a final rule on December 8, 2006. 71 Fed. Reg. 71430 (Dec. 8, 2006). That rule requires operators to provide each mine escapeway with a lifeline that is "[l]ocated in such a manner for miners to use effectively to escape." 30 C.F.R. § 75.380(d)(7)(iv). Each lifeline must be equipped with directional indicators showing the route of escape, indicators

marking a branch line that is attached to the lifeline and leads to a cache of stored self-contained self-rescuers providing breathable air for emergencies, and indicators marking a branch line attached to the lifeline and leading to a refuge alternative for miners unable to escape. 30 C.F.R. § 75.30(d)(7)(v), (vii).

In December 2007, obedient to the statutory requirement that the Secretary or his representative conduct frequent inspections of mines to ensure compliance with mandatory safety standards, Thomas J. Whitehair II, Special Investigator for the Department of Labor's Mine Safety and Health Administration, conducted an inspection of the Cumberland Mine near Waynesburg, Pennsylvania. Whitehair inspected four of the mine's escapeways over a four-day period and issued a citation for each, alleging violation of the lifeline requirement of § 75.380(d)(7)(iv). He further designated each violation as significant and substantial, finding that the lack of adequate lifelines would have delayed miners escaping from an emergency, which would have been reasonably likely to result in serious injury or death.

### B. The Administrative Proceedings

On April 11, 2008, the Secretary filed a petition for assessment of civil penalty for the violations. Cumberland contested the citations before an administrative law judge, who deleted the significant and substantial designations on January 21, 2011. *See* 33 FMSHRC 1482. Thereafter, the Commission heard the petition for review and granted the petition. The Commission reversed and remanded to the ALJ for the imposition of penalties. On October 25, 2011, the ALJ issued a decision on remand imposing penalties. After the Commission denied Cumberland's petition for discretionary review, Cumberland filed the present petition for review with this court on November 29, 2011.

Because our review is dependent in part on the sufficiency of the evidence in the administrative proceedings, we will set forth the relevant evidence in some detail, as well as make further references to the record in our analysis. The evidence was presented in the testimony of Inspector Whitehair relating his findings and conclusions in the four-day visit to the mine in December 2007. Whitehair first testified as to his experience in mining and mine safety. According to that testimony, he had twenty-two years experience inspecting mines for MSHA and an additional fourteen years experience working in mines, including in mine safety positions. He then testified as to his findings of violations at the Cumberland Mine.

### 1. The Violations

#### a. The December 6, 2007, Violation

Whitehair testified that he inspected the No. 1 belt entry of the Five Butt East Longwall section on December 6, 2007. He found three violations in the provision of that lifeline which would have delayed miners in escaping in the event of an emergency. First, it was hung so high from the mine floor that it would have been difficult or impossible for many miners to reach. Second, it was suspended from J-hooks that pointed in different directions. And third, cables and waterlines ran underneath and perpendicular to it.

Whitehair further testified that these conditions would have delayed miners in escaping from an emergency. First, because many would have found the lifeline out of reach, they would have needed to use a tool to access it. Second, miners would have been forced to use that tool to flip the lifeline off the J-hooks, which were pointed in all directions    a task Whitehair testified "would take considerable doing and a considerable amount of time." Third, once off the hooks, the lifeline would

fall on top of the water lines and cables that ran underneath and perpendicular to it, requiring miners to release the lifeline and search for it on the other side of the cables and waterlines.

Whitehair further testified that this delay would have been reasonably likely to result in injury. He believed that in the event of an emergency during which miners would need a lifeline, they would not be able to escape and would eventually succumb to carbon monoxide poisoning. The ALJ credited that testimony.

### b. The December 7, 2007, December 10, 2007, and December 11, 2007, Violations

The evidence is similar with respect to the other three violations. Whitehair testified that on December 7, 2007, the lifeline in the No. 2 track entry for the Five Butt East Longwall hung out of reach for many miners throughout most of the track entry. He also observed track equipment, cables, and waterlines under the lifeline.

Whitehair testified that on December 10, 2007, he observed that the lifeline in the No. 2 track entry of the Eight Butt East section was hung high and out of reach for many miners throughout most of the track entry. He also observed track equipment, cables, and waterlines under the lifeline.

On December 11, 2007, Whitehair found nearly the entire lifeline in the No. 2 track entry of the Fifteen Butt East section hung high and out of reach for many miners. He also testified that it was suspended over track equipment.

Whitehair testified that the track equipment under the lifeline would delay miners attempting to escape an emergency. In thick smoke, the lead miner would be blinded and would run

into the track equipment. That could injure him or rupture his self-contained self-rescuer the portable oxygen source providing breathable air that each miner should have during an emergency exposing him to deadly smoke. Even if the lead miner was unscathed, running into track equipment would delay all the miners attempting to escape. Furthermore, Whitehair testified that the lifeline could snag on the track equipment, causing further delays as panicked, blinded miners attempted to free it. Even if miners knew the track equipment was in their path, they would have to proceed more slowly than they otherwise would to avoid it in the smoky darkness, which would delay their escape. Whitehair also testified that the lifelines falling on cables and waterlines would delay miners escaping. As he had with the first violation, Whitehair testified that he designated these three violations significant and substantial because the delays he described would be reasonably likely to make it impossible for a miner to escape an emergency, meaning the miner would eventually succumb to carbon monoxide poisoning.

In short, based on his other findings, Whitehair found that each of the four violations was significant and substantial.

### C. The Administrative Decisions

As noted above, the administrative law judge, while crediting and adopting the inspector's underlying findings, rejected the findings of significant and substantial violations. 31 FMSHRC at 1163 64. The Commission then reversed the ALJ on the significant-and-substantial issue in the decision that we review today.

The ALJ and the Commission differ over an issue of basic understanding of the statutory and regulatory requirements for determining the significant and substantial status of a violation.

As the Secretary states in his brief to us, "the issue [is] whether, in evaluating whether a violation of Section 75.380(d)(7)(iv)'s requirement regarding the location of lifelines 'is of such nature as could significantly and substantially contribute to the cause and effect of a coal or other mine safety or health hazard' within the meaning of Section 104(d)(1) of the Mine Act, 30 U.S.C. § 814(d)(1), one should assume the occurrence of an emergency necessitating an evacuation in which the lifeline would need to be used." Respondent's Br. 22 23. The answer to this question is essential to the decision of the case and any other case involving violations of statutory and safety regulations created to protect miners and reduce danger during evacuations.

The ALJ adopted a view that Whitehair and the Commission acted inconsistently with Commission precedent in determining that the violations were significant and substantial. The ALJ relied in making that determination, and Cumberland relies before us, on language from *Secretary of Labor v. Mathies Coal Co.*, 6 FMSHRC 1, 3 4 (1984), to the effect that in order to prove a significant and substantial violation the Secretary must prove:

> (1) [T]he underlying violation of a mandatory safety standard; (2) a discrete safety hazard that is, a measure of danger to safety contributed to by the violation; (3) a reasonable likelihood that the hazard contributed to will result in an injury; and (4) a reasonable likelihood that the injury in question will be of a reasonably serious nature.

The ALJ ruled that the Secretary had failed to establish the third element of the *Mathies* test a reasonable likelihood that the hazard contributed to by the violations would result in an injury. 31 FMSHRC at 1163. According to the ALJ, the Secretary had failed to prove that there was a reasonable likelihood that an emergency situation would arise, and

therefore it was not reasonably likely that the hazard contributed to miners being delayed in escaping from an emergency would result in an injury.

The Commission unanimously reversed the ALJ and held that all four lifeline standard violations were significant and substantial. The Commission interpreted the statute and regulation to require assessment of the reasonable likelihood of injury in the circumstance in which the safety equipment becomes relevant. That is, evacuation standards, such as those before the Commission and now before us, "apply meaningfully only when an emergency actually occurs." 33 FMSHRC at 2367. After the ALJ on remand increased the penalties for each violation to account for the significant and substantial findings, Cumberland filed this petition.

## II. ANALYSIS

While Cumberland in its brief before us alleges five issues, our review neatly falls into two parts: (1) did the Commission properly interpret the statutory and regulatory requirement of significant and substantial violation for enhanced penalties?; and (2) if the Commission applied the correct standard, was there sufficient evidence to support the Commission's decision? We discuss those two issues in turn.

### A. The Significant and Substantial Standard

The Mine Act requires the Commission to adjudicate challenges by mine operators to citations and orders issued by the Secretary. *See* 30 U.S.C. § 813. The Commission must defer to "the Secretary's interpretations of the law and regulations." *Sec'y of Labor v. Cannelton Indus., Inc.*, 867 F.2d 1432, 1435 (D.C. Cir. 1989) (internal quotation marks omitted). On review, this court must defer to the Secretary's reasonable

interpretations of the language of the Mine Act. *Id.* (citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984)). "[I]n the statutory scheme of the Mine Act, the Secretary's litigating position before the Commission is as much an exercise of delegated lawmaking powers as is the Secretary's promulgation of a . . . health and safety standard, and is therefore deserving of deference." *Sec'y of Labor v. Excel Mining, LLC*, 334 F.3d 1, 6 (D.C. Cir. 2003) (internal quotation marks omitted). Where, as here, the Secretary and the Commission agree, there is no question but that we must accord deference to their joint view. *RAG Cumberland Res. LP v. FMSHRC*, 272 F.3d 590, 596 (D.C. Cir. 2001).

We analyze the Secretary's and the Commission's interpretations of the Mine Act under the *Chevron* framework. *Id.* Under that familiar standard, "this court, of course, must give effect to the unambiguously expressed intent of Congress." *Cannelton Indus., Inc.*, 867 F.2d at 1435 (internal quotation marks omitted). If "the statute is silent or ambiguous with respect to the specific issue," the court defers to the Secretary's interpretation provided the interpretation is "'a permissible construction of the statute.'" *Id.* (quoting *Chevron*, 467 U.S. at 843).

30 U.S.C. § 814(d)(1) provides that a significant and substantial violation is one that is "of such nature as could significantly and substantially contribute to the cause and effect of a coal or other mine safety or health hazard." We first consider the Secretary's argument that this language unambiguously expresses Congress's intent to require decisionmakers evaluating the significant and substantial nature of violations of emergency safety standards such as § 75.380(d)(7)(iv) to assume the existence of the contemplated emergency.

11

The Secretary argues that Congress's use of the words "could" and "contribute" and the phrase "cause and effect" to describe significant and substantial violations unambiguously compels his interpretation. Specifically, the Secretary argues that "it is impossible to determine whether the violations of Section 75.380(d)(7)(iv) significantly and substantially contributed to the cause and effect of the hazard in question miners being unable to escape quickly from a mine during an emergency in which miners would need to use the lifeline without assuming the occurrence of such an emergency." Respondent's Br. 27. The Secretary also argues that the word "could" refers to the violation's intrinsic capacity to contribute to the hazard, not to any specific probability that it will. *Id.* at 28 (quoting *United States v. Peterson*, 538 F.3d 1064, 1072 (9th Cir. 2008)). Although the Secretary does not flesh this argument out, he appears to mean that because intrinsic capacity is enough, a violation of an emergency safety standard can be significant and substantial even if an emergency is not likely.

We do not think the Mine Act's language unambiguously compels the Secretary's interpretation. The Secretary's argument that "could" refers to intrinsic capacity rather than probability overlooks the fact that the statute refers to a violation that could "*significantly and substantially* contribute to the cause and effect of a . . . hazard." 30 U.S.C. § 814(d)(1) (emphasis added). Because the two adverbs inherently suppose a degree of contributing, we cannot hold that the language unambiguously excludes a probabilistic approach to the factfinder's determination that a particular violation falls within the ambit of the statutory language. We therefore reject the Secretary's proposition that his interpretation can be upheld under the first prong of *Chevron*.

Perhaps in the evaluation of the possible significant and substantial nature of a violation of general safety standards not contemplating an emergency, the Secretary and the Commission might focus exclusively on the propensity of the violation to "contribute to the cause and effect" of a safety or health hazard. But violations of emergency safety standards raise a different set of problems. Those standards   and specifically, the standards effectuating the MINER Act's protection of escape   protect specifically against hazards that may arise after an emergency has already occurred. Despite that fact, inspections determining the compliance of mine operators with the standard must be made in the absence of the contemplated emergency. Therefore, in the view of Cumberland and the ALJ, the Secretary should weigh the probability variable independent of the violation, that is, of the probability of a hazard arising in the first place. On that issue, § 814(d)(1) is silent. We cannot, therefore, say that the intent of Congress is clear and unambiguous so as to allow the invocation of *Chevron* step one.

It may be, as the Secretary argues, that the term "hazard" in § 814(d)(1) accounts for the probability of an emergency occurring because the hazard in this case can only be stated in terms that assume the existence of an emergency. But it may also be, as Cumberland argues, that the phrase "could significantly and substantially contribute," which calls to mind an evaluation of chance, properly accounts for all probability variables in any given significant and substantial evaluation, including the probability of an emergency occurring. We therefore proceed to the second step of the *Chevron* analysis and evaluate the reasonableness of the Secretary's interpretation.

Although the statute does not unambiguously compel the Secretary's interpretation, that interpretation is nonetheless reasonable. As the Commission explained, emergency safety standards are fundamentally different from non-emergency

standards because they are designed to apply meaningfully only in times of emergency. If the Secretary interpreted, or if we compelled the Secretary to interpret, § 814(d)(1) to command decisionmakers *not* to assume the existence of the contemplated emergency when evaluating the significant and substantial nature of a violation of emergency safety standards, it would appear unlikely that any violation of those standards would ever be "significant and substantial." That is, the violation of those standards apparently would never, or at least rarely, contribute to the existence of the emergency so that the scale would be loaded against the finding. Given that the violation of those standards could be expected to have serious, indeed tragic, consequences, it is reasonable for the Secretary to interpret the statute and his own regulations to avoid that odd result.

To expand on that thought, the interpretation advanced by Cumberland would be inconsistent with our prior holding that the significant and substantial inquiry should focus, as the statutory text directs, on the nature of the violation. *Sec'y of Labor v. FMSHRC*, 111 F.3d 913, 917 (D.C. Cir. 1997). Again, a violation of the lifeline standard could only contribute to the delayed evacuation from emergency hazard if there is an emergency, but the likelihood of an emergency will usually have nothing to do with the violation of the emergency safety standard. Thus, if the decisionmaker does not assume the existence of the emergency, then his focus must necessarily shift away from the nature of the violation to the likelihood of the emergency.

None of Cumberland's arguments for rejecting the Secretary's interpretation is persuasive. First, Cumberland argues that the Secretary's interpretation is inconsistent with the Commission's *Mathies* test. As noted above, the Commission held in *Mathies* that to demonstrate a significant and substantial violation, the Secretary must prove four elements: (1) the

underlying violation of a mandatory safety standard; (2) a discrete safety hazard  that is, a measure of danger to safety  contributed to by the violation; (3) a reasonable likelihood that the hazard in question will result in an injury; and (4) a reasonable likelihood that the injury in question will be of a reasonably serious nature.  6 FMSHRC at 3 4.  Cumberland argues that by assuming the existence of an emergency, the Commission excused the Secretary from his burden of proving the second and third elements of the *Mathies* test.  The hazard here is delayed escape from an emergency, but there can be no delayed escape, unless there is an emergency in the first place.  Similarly, if there is no emergency, then there can be no resulting injury.

The problem with these arguments is that they assume that the *Mathies* test forbids the decisionmaker from assuming the existence of an emergency.  It does not.  Indeed, in the only Commission precedent to have considered whether assuming the existence of an emergency is consistent with the *Mathies* test, the Commission split on the question, resulting in a non-precedential opinion.  *See Sec'y of Labor v. Manalapan Mining*, 18 FMSHRC 1375 (1996).  Further, ALJs have routinely assumed the occurrence of the contemplated emergency in evaluating the significant and substantial nature of violations that only come into play in the event of an emergency.  *See, e.g.*, *Twentymile Coal Co.*, 29 FMSHRC 806, 810  11 (2007) (ALJ); *American Coal Co.*, 29 FMSHRC 252, 263 (2007) (ALJ), *aff'd on other grounds*, 29 FMSHRC 941 (2007); *Anderson Sand & Gravel*, 21 FMSHRC 186, 191 (1999) (ALJ).  Therefore, contrary to Cumberland's argument, the Secretary's argument is not inconsistent with *Mathies*.  In addressing this argument, we do not intend to imply that we are adopting the *Mathies* test, the validity of which is not challenged here.  Instead, we simply reject Cumberland's argument that the Secretary's interpretation arbitrarily or capriciously departs from Commission precedent.

Cumberland also argues that the Secretary's interpretation ignores Commission precedent by excusing the Secretary from his duty to consider all of the facts surrounding a violation. Petitioner's Br. 33 34 (citing *National Gypsum*, 3 FMSHRC 822, 825 (1981)). But we have held that decisionmakers should not consider facts unrelated to the violation when undertaking a significant and substantial evaluation. *Sec'y of Labor v. FMSHRC*, 111 F.3d at 917. In this case, the Secretary met the standard in our cases and the *National Gypsum* standard by considering all of the facts *surrounding the violation*.

Finally, Cumberland argues that the Secretary's interpretation ignores Commission precedent rejecting an interpretation of the statute by which all mine safety and health standards would be significant and substantial except those that had no potential to cause injury. *National Gypsum*, 3 FMSHRC at 825. That general rule, which would apply to all violations, differs from the narrower rule at issue here, which applies only to violations of emergency safety measures. Because the stakes are much higher in emergency situations, a rule that would make many or most violations of emergency safety measures significant and substantial is distinguishable from a rule that would make all violations of all safety measures significant and substantial. Moreover, the Secretary proposes a rule that would require a reasonable likelihood of injury, whereas *National Gypsum* rejected a broader rule that would have allowed a significant and substantial finding anytime there was any potential of injury, not just where injury was reasonably likely. For these reasons, Cumberland's argument fails.

*B. Substantial Evidence*

Cumberland next argues that even if the Commission applied the correct significant and substantial standard, its determination that the violations at issue here were significant and substantial is not supported by substantial evidence. Under the substantial evidence standard of review, we may not reject reasonable findings and conclusions, even if we would have weighed the evidence differently. *Sec'y of Labor v. Keystone Coal Mining Corp.*, 151 F.3d 1096, 1104 (D.C. Cir. 1998). We must therefore examine Cumberland's specific allegations and "determine whether a theoretical 'reasonable factfinder' could have reached the conclusions actually reached by the Commission and the ALJ." *Id.* (quoting *United Steelworkers of America v. NLRB*, 983 F.2d 240, 244 (D.C. Cir. 1993)). Applying this "highly deferential standard," we conclude that the Commission's decision rests on substantial evidence. *Sec'y of Labor v. FMSHRC*, 111 F.3d at 918.

Cumberland argues that in finding that these violations were significant and substantial, the Commission refused to consider evidence of preventative measures that would have rendered both injuries from an emergency and the occurrence of an emergency in the first place less likely. Cumberland contends that in doing so, the Commission failed to consider all evidence including that which detracts from its position, and thus, its conclusion fails the substantial evidence test. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *American Wrecking Corp. v. Sec'y of Labor*, 351 F.3d 1254, 1261 (D.C. Cir. 2003) ("The substantial evidence rule requires that the Commission reasonably consider material evidence on both sides, as evidence that is substantial when viewed in isolation may become insubstantial when contradictory evidence is taken into account.").

The first problem with Cumberland's argument is that assuming the existence of an emergency in which a lifeline would be necessary also assumes an emergency in which all of the redundant safety measures Cumberland seeks to rely on have failed. The second problem is that consideration of redundant safety measures is inconsistent with the language of § 814(d)(1). As we have explained, the focus of the significant and substantial inquiry is the nature of the violation. "By focusing the decisionmaker's attention on 'such violation' and its 'nature,' Congress has plainly excluded consideration of surrounding conditions that do not violate health and safety standards." *Sec'y of Labor v. FMSHRC*, 111 F.3d at 917. Because redundant safety measures have nothing to do with the violation, they are irrelevant to the significant and substantial inquiry. *Id.*; *see also Buck Creek Coal, Inc. v. FMSHA*, 52 F.3d 133, 136 (7th Cir. 1995) (rejecting an argument that redundant safety measures detracted from a significant and substantial finding).

Finally, Cumberland argues that the Commission's significant and substantial findings are not supported by substantial evidence because "even assuming a hypothetical fire . . . , the evidence shows that it is not reasonably likely that such an event would result in a serious injury." Petitioner's Br. 46. As the Secretary points out, this objection misapprehends how the *Mathies* test applies. Under *Mathies*, the question is whether the hazard contributed to is reasonably likely to result in serious injury. 33 FMSHRC at 2366. Cumberland argues that substantial evidence does not support the conclusion that a hypothetical mine fire would be reasonably likely to result in serious injury, but the hazard here is not a hypothetical mine fire    it is *delayed escape* from one. Putting that aside, a review of the record demonstrates that substantial evidence does in fact support the Commission's conclusions.

Whitehair's testimony, which the ALJ accepted, provided a sufficient basis upon which a reasonable factfinder could conclude that the lifeline violations at issue here would delay miners from escaping from an emergency and that such a delay would be reasonably likely to cause serious injuries or death.

With respect to the December 6 violation, the evidence we set forth above in the discussion of the violations was credited by the ALJ and constitutes substantial evidence that the lifeline violation Whitehair identified in the No. 1 belt entry of the Five Butt East Longwall section contributed to the hazard of a miner being delayed or unable to escape during an emergency and that the hazard was reasonably likely to result in serious injury.

Cumberland argues that in the event of a fire, miners were unlikely to be hurt because they could use the belt structure to guide them out of the mine and could use the waterline running along the belt as a directional indicator. That argument is unpersuasive. First, the record demonstrates that miners are trained to use lifelines in emergencies, and thus, even if they did think to use the belt structure or the waterlines, they would still be delayed as they first attempted to find and use the lifeline. Second, Whitehair testified that because the waterline and belt structure lacked the lifeline's required directional indicators, "it would be very easy [for miners] to become confused and maybe turn around and go the wrong direction, because it's not going to tell them what direction they are going." Third, Cumberland's argument ignores another lifesaving advantage an adequate lifeline would have over a cable or waterline: lifelines are designed to guide miners to alternative refuges, and waterlines and cables are not. Therefore, the Commission's findings were reasonable, and under the substantial evidence

standard of review, we must accept them. *See Keystone Coal Mining Corp.*, 151 F.3d at 1104.

Again, without rehashing the evidence set forth above, the same conclusion follows with respect to each of the other three violations. The Commission's decision rested on substantial evidence. We therefore reject Cumberland's evidentiary objection and must deny its petition.

While Cumberland advances other arguments, none warrant further discussion.

## CONCLUSION

Because the Commission applied the correct significant and substantial standard, and because substantial evidence supports each of the significant and substantial determinations in question, the petition for review is denied.

*So ordered.*