**AUSTIN POWER, INC., Petitioner,**

v.

**SECRETARY OF LABOR, Mine Safety and Health Administration (MSHA) and Federal Mine Safety and Health Review Commission, Respondents.**

No. 88–4051.

United States Court of Appeals, Fifth Circuit.

Nov. 30, 1988.

Rehearing and Rehearing En Banc Denied Dec. 29, 1988.

Steven R. McCown, Jennifer A. Youpa, Jenkens & Gilchrist, Dallas, Tex., for petitioner.

L. Joseph Ferrare, Sol., Federal Mine Safety & Health Review Com'n, Washington, D.C., Vicki J. Shteir–Dunn, U.S. Dept. of Labor, Arlington, Va., for respondents.

Before CLARK, Chief Judge,
BROWN, and JOLLY, Circuit Judges.

CLARK, Chief Judge:

Austin Power, Inc. appeals the decision of the Federal Mine Safety and Health Review Commission (Commission) which affirmed an administrative ruling that Austin Power, Inc. had violated the mandatory safety standard established in 30 C.F.R. § 77.1710(g). Finding that the decision is supported by substantial evidence on the record as a whole, we affirm.

*Facts*

On August 19, 1985, Steve Smith, a rigger employed by Austin Power, Inc., died in a fall at the Big Brown Strip Mine in Fairfield, Texas. Austin had contracted with De Mag Corp. to erect a cross-pit spreader at that location. This spreader is an extremely large earth-moving machine with two conveyor belt booms, one 20 meters and another 70 meters. On the day of the accident, members of the Austin Power crew had removed the shorings from beneath the 20 meter boom and installed counterweights to balance the arm. During the process of removing the shorings, the boom had been moved laterally by a crane, which attached to the boom by a wire choker. When that same crane attempted to walk the boom back into position after the work had been completed, workers determined that a different lifting device, known as a cherry picker, would have to be used to pass the smaller boom underneath the 70 meter boom. This required that another choker be installed on the smaller boom so that the load could be transferred from the large crane to the cherry picker.

Three Austin employees, among them Steve Smith, went out onto the walkway attached to the side of the 20 meter boom to accomplish this task. This walkway was then positioned 36 feet above the ground, and was equipped with two guardrails and removable floor plates of metal grating. One guardrail was 42 and the other was 21 inches above the floor. A raised iron toeboard was located at the floor level.

Smith was to form the choker, which involved swinging a wire rope underneath the walkway and catching it on the other side. To accomplish this procedure, Smith knelt on the floor grating with his head and hands outside the lower rail. Although he was wearing a safety belt, Smith did not "tie-off," i.e. secure his lines to the walkway or guardrail. The crane operator continued to guide the boom in a lateral motion as Smith, crouched in this position, went about his task. While Smith was attempting to swing the wire beneath the walkway, an eyelet on the opposite end of the boom snapped. This caused the entire boom to suddenly jerk upwards.

The three men, along with pieces of the floor grating on the walkway, were thrown into the air. Fortunately, Arent and Saulsburg fell back onto the walkway and were able to grab it and hold on as they came down. Steve Smith, however, fell 36 feet to the ground and died as a result of injuries to his head.

Following an investigation by the Mine Safety and Health Administration, three citations were issued to Austin Power for violations of safety standards. One charged that because Smith and the other employees were on the boom while it was being moved, the crane operator had not made certain all persons were in the clear before beginning his operation, as required by 30 C.F.R. § 77.1607(g). A second violation charged that the walkway was not maintained in good condition since the panels of grating in the floor were not clamped down. The investigator also cited Austin for violation of 30 C.F.R. § 77.1710(g) because although the three employees were wearing safety belts when the accident occurred, none had tied-off.

Austin Power appealed the citations to the Mine Safety and Health Review Commission. A hearing was held before an administrative law judge (ALJ), who upheld the citations for violation of § 77.1607(g) and § 77.1710(g). Austin Power then petitioned for review of the decision by the Commission. Three of five commissioners affirmed the ruling that the failure to tie-off was a violation of § 77.1710(g). Austin Power now petitions this court to review the Commission's decision. We deny the petition and affirm the decision of the Commission.

*Standard*

Section 77.1710(g) provides that employees working in a surface coal mine are required to wear safety belts and lines where there is a danger of falling. 30 C.F.R. § 77.1710(g). The standard employed to determine whether a danger of falling exists is that of a reasonably prudent person familiar with the factual circumstances. *Great Western Electric Co.*, 5 F.M.S.H.R.C. 840, 842 (1983). After a full hearing on the merits, the ALJ found that Smith's position on the walkway, together with the nature of the task he was performing, did place him in danger of falling. He determined that Smith's head and hands were outside the lower guardrail and that his hands were occupied with swinging the choker under the walkway and catching it on the other side. The ALJ further found that swift movements would be necessary to catch the portion of the choker being passed underneath the walkway, and thus one could reasonably conclude that Smith's body would have been partially outside the rail during the course of the operation. The ALJ concluded that given the height of the boom, Smith's physical position, and the activity to be performed, the railing afforded Smith little protection.

The Commission likewise found that under all the circumstances involved in the particular task, a reasonably prudent person would have recognized a danger of falling and tied off. We review to determine whether, on the record as a whole, there is substantial evidence to support the finding that a danger of falling existed as to Smith. 30 U.S.C. § 816. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support [the Commission's] conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938).

Austin Power asserts that the finding that a danger of falling existed was based entirely on the ALJ's own impressions, in total disregard of testimony at the hearing. However, every witness who observed Smith immediately before the accident testified that Smith was on his knees, 36 feet above the ground, with his hands and head outside the lower rail. Austin Power itself recognized the potential hazards inherent simply in working above ground level by requiring that workers wear a safety belt anytime they worked off the ground. They contend, however, they only required employees to tie off if they were outside the guardrails.

Each description of the manner in which the choker was to be installed left no ques-

tion that both Smith's hands would be occupied as he sought to pass the sling wire under the grating and catch and fasten it. His hands were not free to hold onto the structure should the need arise or to steady himself or regain his balance. Arent, who was with Smith on the walkway, testified that he tied off anytime his hands were occupied. The typical situations he cited were if he was holding a wrench or tightening a bolt. Clearly these activities allow greater opportunity to use the hands for stability than did swinging the sling wire and attempting to catch it.

As support for its contention that no danger of falling existed, Austin Power highlights the fact that the mine safety inspector who investigated the accident did not tie off while using the same walkway positioned as it was when Smith fell. Assuming the inspector's actions could offset evidence of the actual conditions, we would note a significant difference in the two factual circumstances. Inspector Summers was walking along the walkway. Smith was stationary and engaged in an activity which required swift movements and occupied both his hands. Crane operator Crowell testified that although he would not tie off if he was moving along the walkway, he would secure his line once he reached his work station.

The boom was in motion while Smith knelt on the floor and reached outside the rails. Inspector Summers stated that, although he knew of no safety standard which expressly prohibited the presence of workers on moving machinery, if he witnessed workers located 36 feet off the ground on equipment which was being moved, he would issue an imminent danger order. In his opinion, this situation presented a danger of falling since the walkway would be less stable. He also observed that there was no reason the choker could not be installed after the crane stopped. Austin Power argues that the walkway was designed specifically to allow free access to the boom by employees during operations. This intended use of the walkway while the boom was in a regular fixed position does not absolve employees from compliance with applicable safety procedures while on the boom. The mere fact that it was not unusual for workers to "ride" the walkway does not preclude a finding that riding the moving boom could involve a danger of falling. Woodson, general project supervisor for Austin Power, admitted that he tries to keep people off the boom as much as possible. He testified that during part of the move, the three men involved here did stay on the stable end of the boom, but prior to the accident that they had walked out onto the opposite end because they had "no choice."

With the aid of photographs, witnesses were able to place Smith's location while installing the choker as along the walkway rather than at its end. Crowell testified that he had installed similar chokers many times, and that when he was in Smith's particular location he would remove a piece of grating in order to reach under the walkway. He confirmed that he always ties off in that instance because there is a danger of falling through while bent over the opening in the floor. Foreman Patterson observed Smith wrap the choker wire around the walkway frame and under the grating, but he stated that he never actually saw Smith remove any of the gratings. All the gratings on the walkway were upset during the accident. Afterward, some grating were missing and some were ajar. Thus, there is no positive evidence as to whether Smith had removed or dislodged pieces of grating in the floor on this occasion. However, his location on the walkway, coupled with Crowell's testimony, suggests he may have done so in order to attach the choker. If a piece of floor had been removed, a reasonable person would recognize a danger of falling.

Austin Power levies its most forceful argument against the following portion of the ALJ's opinion:

After careful examination of the photographic exhibits and the testimony in this case, I conclude that Mr. Smith's position on the walkway while in the process of installing the choker in question placed him in danger of falling. While on his knees, Mr. Smith's hands were obviously occupied in attempting to swing or loop

the choker cable under the walkway to the other side. Mr. Patterson indicated that Mr. Smith intended to catch the cable on the other side. Mr. Smith would have had to act swiftly to swing the cable over the edge of the walkway and then move quickly to the other side to catch it. The testimony establishes that Mr. Smith was reaching under the middle railing of the walkway and that his head was beyond the railing. Mr. Smith was some 36 feet off the ground while performing the choker task, and *I believe one can reasonably conclude that in the course of the work being performed as testified to by Mr. Arent and Mr. Patterson, Mr. Smith's body was partially outside of the railing.* Since Mr. Smith was on his knees reaching under the middle railing, I find that the railing afforded him little protection and that he could have lost his balance while attempting to swing the choker under the walkway and fallen to the ground.

Under the circumstances here presented, I believe it should have been clear to a reasonably prudent person that a danger of falling existed and that Mr. Smith should have been tied off. This is particularly true here, where the evidence establishes that Mr. Smith was under the direct observation and supervision of rigging foreman Patterson. I conclude that a reasonable and prudent person in Mr. Patterson's position would have instructed Mr. Smith *to tie off while performing* the work of installing the choker in question.

Austin Power focuses its criticism on the emphasized wording. It characterizes this language as a finding purportedly based on eyewitness testimony which, in fact, is unsupported in the record. It is true that no one said he saw any part of Smith's body, other than his hands and head, outside the railing before the fall. However, the characterization is inapt. It would be hypercritical to read the ALJ's words as anything other than a conclusion that, during the course of accomplishing the task assigned, Smith would have had to lean more of his body outside the railing to swing the choker wire from one side of the walkway and

catch it on the other. The opinion should be given its natural and probable meaning and we so construe it.

Smith's fall was certainly initiated by the failure of the eyelet and the resulting sudden force which acted upon the three men. This could not reasonably have been anticipated. However, Crowell described an unexplained jerk or bump in the boom during the loading of the counterweights. He testified that he was certain Smith had also felt the movement because Smith had commented on it and asked if Crowell had caused it. Crowell answered that he had not. Neither man reported the incident then, but in hindsight Crowell considered it important. In light of this evidence of an earlier unusual movement in the boom, a reasonably prudent person could conclude under the circumstances that another violent movement could make a fall possible. We agree with the ALJ and a majority of the Commission that Smith's physical position and the nature of his work, in this particular industrial setting, presented a danger of falling. He should have been instructed to tie off.

### Significant & Substantial Violation

Austin Power also contends that even if the finding of a violation is supported by the evidence, that violation was not significant and substantial. Their primary argument is that the event which actually caused Smith's death was an unexpected equipment malfunction and not Smith's failure to tie off to the boom. There are four prerequisites to establishing a significant and substantial violation of a safety standard: 1) an underlying violation; 2) a discrete safety hazard; 3) a reasonable likelihood that the hazard will result in injury; and 4) a reasonable likelihood that the injury will be serious. *Mathies Coal Co.*, 6 F.M.S.H.R.C. 1, 3–4 (1984). The evidence adduced supports the finding of a violation of 30 C.F.R. § 77.1710(g). A danger of falling is a necessary element of this violation, so by the very nature of a violation there was a discrete safety hazard. The working height of 36 feet establishes that a fall would almost certainly result in

serious injury. Austin Powers' argument is without merit.

Likewise, the finding that the violation was due to the negligence of Austin Power is supported by substantial evidence in the record. Supervisor Patterson was observing the work on the boom and had a full view of Smith kneeling on the walkway. He should have, in the exercise of ordinary care, realized the hazard and instructed Smith to tie off.

### Conclusion

Substantial evidence on the record as a whole supports the decision of the Commission. The petition for review is denied and the decision is

AFFIRMED.

E. GRADY JOLLY, Circuit Judge dissenting:

I respectfully dissent from the majority's findings, first, that a danger of falling existed such that a mandatory safety standard had been violated, and second, that the violation was significant and substantial.

### I

Substantial evidence existed at trial that Smith's unfortunate accident would not have occurred but for the unforeseeable breaking of an eyelet on the opposite end of the boom. Our concern should therefore be with the question, would a reasonably prudent person familiar with the factual circumstances surrounding Smith's position on the platform have recognized a danger of falling under normal circumstances that would have warranted his tying off?

Three things, I believe, require us to find no danger of falling here. First, it is undisputed that when the eyelet broke, Smith was propelled upward off the platform. He did not slide out between the guardrails or fall over the top guardrail. Thus, any inference that he was in danger of falling prior to the eyelet failure is pure speculation without a validating basis.

Second, the guardrails on the boom on which Smith had been kneeling were about twenty-one inches apart. The walkway had a toe board made of angle iron, which cut down the space between the floor of the walkway and the middle guardrail. Smith weighed 235 pounds and was kneeling on the walkway with his head and hands between the middle and bottom rails. There was no substantial evidence at trial from which the ALJ could conclude that barring unforeseeable mishap, Smith, positioned as he must have been, with his size, weight, and low center of gravity, was in danger of falling *between* the first and second rails of the guardrail running the walkway's perimeter, even if he had needed to make some swift movements to secure the choker.

Third, the guardrail at issue here is a standard piece of safety equipment. Construction workers cannot be expected to impede their mobility for purely speculative dangers they might encounter above the ground. Smith had no notice or reason to suspect that the eyelet would fail. Its failure was a freak accident. Requiring him to tie off, when no worker familiar with the circumstances surrounding the construction job and Smith's position on the walkway believed that he was in danger of falling, is the same as requiring the general public somehow to be equipped with air bags in case mall elevators suddenly fail.

The issue should not be whether a theoretical danger of falling existed, but rather, whether a reasonably prudent person, positioned as Smith was, and engaged in the same task, would recognize a danger of falling that warranted the wearing of a safety belt and line. *Secretary of Labor v. Great Western Electric Co.*, 5 F.M.S.H. R.C. 840, 842 (1983).

The majority notes that the crane operator Crowell had felt the boom make an unexplained bump during loading of the counterweights, and that a reasonably prudent person *could* conclude that another violent movement *could* make a fall *possible*. Our concern though must be with the safety precautions a reasonably prudent person *would* have thought warranted under the circumstances. There simply was not sufficient evidence on which the ALJ could base a finding that the unexplained

bump was in fact related to the eyelet failure, or that Smith should have given the bump any significance.

The ALJ, as trier of fact, drew his conclusion that a danger of falling existed from the facts that the walkway was thirty-six feet above the ground, Smith's head and hands were outside the lower guardrail, and his hands were occupied with swinging the choker. But no one testified that any part of Smith's body other than his head and hands was outside the railing before the fall, and no one familiar with Smith's situation prior to the accident believed he was in any danger of falling. Only the inspector from the Mine Safety and Health Administration, who *himself* did not tie off when he went up on the *same* walkway, stated his belief that a danger of falling existed that warranted tying off. Smith, kneeling on the platform, was certainly in no greater danger of falling than the inspector would have been if another similar failure had jerked the boom. Smith died because he was catapulted *up off* the walkway, not because he slid out underneath the guardrail.

Further, there is no evidence *whatsoever* that Smith in fact removed any gratings in order to pass the choker under the walkway, as suggested by the majority. There was testimony only that the metal gratings creating the platform fit securely together, and could not be displaced except by an upward force, which is consistent with their having been lifted up by the jerk of the boom when the eyelet failed.

Because I believe there is no substantial evidence in the record as a whole to support the ALJ's finding that a danger of falling existed, I would reverse the Commission's decision affirming the ALJ's ruling that mandatory safety standard 30 C.F.R. 77.1710(g) was violated by Smith's decision not to tie off.

## II

I also take issue with the majority's affirmation of the Commission's ruling that the violation was a "significant and substantial one" for the purpose of assessing an appropriate civil penalty.

A violation is designated "significant and substantial" if, "based on the particular facts surrounding the violation, there exists a reasonable likelihood that the hazard contributed to will result in an injury or illness of a reasonably serious nature." *Secretary of Labor v. National Gypsum*, 3 F.M.S.H.R.C. 822, 825 (1981). The Secretary must prove:

> (1) the underlying violation of a mandatory safety standard; (2) a discrete safety hazard—that is, a measure of danger to safety contributed to by the violation; (3) a reasonable likelihood that the hazard contributed to will result in an injury; and (4) a reasonable likelihood that the injury in question will be of a reasonably serious nature.

*Secretary of Labor v. Mathies Coal Co.*, 6 F.M.S.H.R.C. 1, 3–4 (1984).

For the reasons explained in part I above, on review of the record, I believe that the Secretary has failed to prove at the outset that a mandatory safety standard was violated. Further, even if the Commission had properly found that a danger of falling existed, no substantial evidence exists in the record to support a finding that under the circumstances a fall was reasonably likely—the third prong of the "significant and substantial" test. The majority fails to address this third prong, stating only that a violation occurred (first prong), the danger of falling constituted a discrete safety hazard (second prong), and a fall from thirty-six feet would almost certainly result in serious injury (fourth prong).

Given Smith's size, positioning, the testimony of the witnesses and the unforeseeable manner in which the accident actually occurred, it cannot be said that a fall was "reasonably likely" if work had proceeded normally, even if, as the majority concludes, some slight danger of falling had existed.

Reasonable likelihood is more than theoretical possibility. There was no evidence adduced at trial of more than a speculative possibility that Smith *could* have fallen from his place on the walkway as a result

of his decision not to tie off in the absence of the unforeseeable eyelet failure. Without a showing that Smith's failure to tie off was reasonably likely to result in injury, no "significant and substantial" ruling should have issued. I would therefore reverse the Commission's "significant and substantial" ruling, and reduce the civil penalty assessed against Austin Power accordingly.

### III

In accordance with the foregoing, I respectfully record my dissent.